IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| YOUNG BOK SONG #379747, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:21-cv-00154 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| TONY PARKER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Young Bok Song initiated this pro se civil rights action under 42 U.S.C. § 1983 while he was incarcerated at Trousdale Turner Correctional Center (TTCC) in Hartsville, Tennessee. Plaintiff has been transferred twice since then: first to Northwest Correctional Complex (NWCX) in Tiptonville, Tennessee, and then to his current place of confinement, Northeast Correctional Complex in Mountain City, Tennessee. The Court denied Plaintiff pauper status under the three-strikes provision of 28 U.S.C. § 1915(g) (Doc. No. 10), and Plaintiff then paid the full filing fee. (Doc. No. 17.) The Court ordered Plaintiff to file a single Amended Complaint (Doc. No. 20 at 1–3), and he complied. (Doc. No. 27.) The Amended Complaint is brought against eleven TTCC officials, two Tennessee Department of Correction (TDOC) officials, and one CoreCivic official. (*Id.* at 17–21.) It was accompanied by several exhibits, (Doc. Nos. 27-1, 27-2), and followed by several motions from Plaintiff. (Doc. Nos. 28–34, 40.) This action is before the Court for initial review of the Amended Complaint and a ruling on the pending motions. For the following reasons, this action will be dismissed.

## I. MOTION FOR EXHIBITS (Doc. Nos. 28, 29) AND TO SUPPLEMENT (Doc. No. 34)

Plaintiff filed two copies of a "Motion for Exhibits" (Doc. Nos. 28, 29), requesting that the Court consider the exhibits attached to the original complaint (labeled A to Z at Doc. Nos. 1-1, 1-2) as exhibits to the Amended Complaint. This request will be granted, and the Court will direct the Clerk to file Doc. Nos. 1-1 and 1-2 as attachments to the Amended Complaint.

Plaintiff also filed a "Motion to Supplement" (Doc. No. 34), requesting that the Court consider a list of "corrections" to the Amended Complaint. This request will be granted as well, and the Court will consider the corrections to the Amended Complaint—*i.e.,* will consider the Amended Complaint as amended via these "corrections"[1]—when conducting the initial review.

## II. INITIAL REVIEW

Because Plaintiff is a prisoner suing governmental officers or employees, the Court must conduct an initial screening and dismiss the corrected Amended Complaint if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(a)–(b).[2] The Court also must apply this standard of review to any claim "brought with respect to prison conditions." 42 U.S.C. § 1997e(c)(1). And because Plaintiff is representing himself, the Court must liberally construe the corrected Amended Complaint and hold it to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

---

[1] The Court herein will refer to the Amended Complaint thus amended as the "corrected Amended Complaint."

[2] This screening requirement is applicable here even though Plaintiff paid the full filing fee; the statute does not render such screening inapplicable based on the plaintiff making such payment. *See* 28 U.S.C. § 1915A.

## A. Factual Background

The Court gave Plaintiff clear notice that, in conducting an initial review, the Court would "consider only information that is on, or attached to, the form" complaint provided by the Court. (Doc. No. 20 at 2; Doc. No. 21 at 2.) As stated above, the Court is also granting Plaintiff's motions to correct and consider previously-filed exhibits. Therefore, the following summary of Plaintiff's factual allegations is drawn from the corrected Amended Complaint (Doc. Nos. 27, 34) and its exhibits. (Doc. Nos. 1-1, 1-2, 27-1, 27-2.)[3] The Court will accept any plausible factual allegation as true, but that is not the case for any assertion that is entirely unsupported by facts, legally conclusory, or frivolous, even though such allegations may be included in this summary for context.

### 1. Solicitation of Tax Fraud and Interception of Stimulus Checks in 2020

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) "provided emergency financial assistance to Americans during the early days of the COVID-19 pandemic through what are commonly referred to as economic impact payments" (EIPs), or "stimulus checks." *Morton v. United States Virgin Islands*, No. 21-1292, 2021 WL 6137867, at *1 (3d Cir. Dec. 29, 2021) (citing Pub. L. 116-136, 134 Stat. 281 (2020)). Plaintiff alleges that, from October 2020 to present day, employees in eleven state prisons—prisons for which TDOC is ultimately responsible—have solicited prisoners to commit "massive tax fraud" by providing incorrect advice regarding prisoners' eligibility for stimulus checks. (Doc. No. 27 at 7–8, 32, 43, 55.) Among the prisons where this solicitation takes places are TTCC and NWCX, two of Plaintiff's former places of incarceration. (*Id.* at 32, 43, 55.) Over that same period, employees in three state prisons run by

---

[3] At the initial review stage, the Court is "permitted to consider materials attached to the complaint, and [] will reference exhibits that [Plaintiff] attached to his complaint when these attachments clarify matters." *Arauz v. Bell*, 307 F. App'x 923, 925 n.1 (6th Cir. 2009) (citations omitted).

CoreCivic have also intercepted stimulus checks mailed to prisoners. (*Id.* at 7–8, 43, 55.) TTCC is among the prisons where this interception takes place. (*Id.* at 30, 55.)

Specifically, from October 14 to October 30, 2020, TTCC Unit Manager Monica Thames advised prisoners that any inmate with a social security number was eligible for a stimulus check. (*Id.* at 25.) Thames based this advice on a federal district court case from the Northern District of California, *Scholl v. Mnuchin*. (*Id.*)[4] Thames provided all prisoners in Unit D with a copy of IRS Form 1040, along with written instructions for using the form to obtain a stimulus check. (*Id.*; *see* Doc. No. 1-1 at 13–18 (Exhibit C, instructions).) Thames offered "a free delivery service for inmate[s] who handed the 1040 form to her." (Doc. No. 27 at 25.) Thames told Plaintiff that she was taking these actions because her superiors told her to do so. (*Id.*)

Plaintiff and several other inmates consulted an inmate working in the TTCC law library, and that inmate advised them that Unit Manager Thames's advice was "legal and legit" under *Scholl*. (*Id.* at 33.) Plaintiff later learned that, since February 2017, this inmate had not been "a legal aide but a leisure library assistant." (*Id.*) TTCC Law Librarian Willetta Grady provided this "wrongful" legal aide. (*Id.* at 8, 25.)

After consulting the legal aide, Plaintiff filled out Form 1040 and gave it to Unit Manager Thames. (*Id.* at 25, 33, 40.) Plaintiff estimates that Thames collected Form 1040 from 150 to 200 prisoners in Unit D. (*Id.* at 25, 40.)

---

[4] The corrected Amended Complaint includes Plaintiff's analysis of how *Scholl* applied to TTCC prisoners. (Doc. No. 27 at 26–27, 40.) This analysis is not factual matter that the Court must accept as true, and the Court will independently consider *Scholl* below. In short, however, *Scholl* involved "a nationwide class of incarcerated individuals su[ing] over the" Internal Revenue Service (IRS) withholding stimulus checks from inmates. *Terry v. Yellen*, No. 3:21-cv-33, 2021 WL 2587237, at *1 (S.D. Ohio June 24, 2021) (citing *Scholl v. Mnuchin* ("*Scholl I*"), 489 F. Supp. 3d 1008, 1021–22 (N.D. Cal. 2020)). The prisoners "ultimately obtained a permanent national injunction barring the IRS from withholding EIPs solely on the basis of a person's incarcerated status." *Hudson v. Dep't of Treasury*, No. 1:21-cv-392, 2021 WL 5782471, at *2 n.2 (W.D. Mich. Dec. 7, 2021) (citing *Scholl v. Mnuchin* ("*Scholl II*"), 494 F. Supp. 3d 661 (N.D. Cal. 2020)).

4

On October 22, 2020, Plaintiff sent a letter to the District Judge who presided over *Scholl*, requesting information about prisoners' eligibility for stimulus checks. (*Id.* at 25; Doc. No. 27-2 at 43–44 (Exhibit 15, TTCC mail log).) On November 9, Plaintiff received a letter from the law firm that represented that lead plaintiffs in *Scholl*. (Doc. No. 27 at 25.) From this letter, Plaintiff "found out that he and more than 90% of TTCC inmates in fact committed a massive tax fraud" based on erroneous advice from Thames and the inmate working in the law library. (*Id.*)

The inmates who filed Form 1040 themselves received stimulus checks. (*Id.* at 41.) The inmates who gave Form 1040 to Unit Manager Thames, however, did not receive a stimulus check, and Plaintiff alleges that Thames and other CoreCivic staff intercepted the stimulus checks sent to these inmates. (*Id* at 8, 40–41.) Plaintiff believes that Thames "probably" accomplished this "through the computer online filing," using "her Notary Public position" and her access to "inmates' personal & confidential information with [their] signature on it." (*Id.* at 41.) CoreCivic staff covered up the interception of checks by saying, "it is up to the IRS who actually issues the EIP checks." (*Id.*) This prevented inmates who from "reclaim[ing]" checks or "investigat[ing]" the situation. (*Id.*) Plaintiff alleges that, in February 2021, he was informed that Thames "was in Federal custody due to her role" in the scheme to intercept inmates' stimulus checks. (*Id.*)

Plaintiff regards tax fraud as criminal, unpatriotic, and against his religious beliefs. (*Id.* at 27–29.) Plaintiff is also concerned that prisoners' rehabilitation is not well served by the influx of money from stimulus checks. (*Id.* at 28–29.) Prisoners having more money caused TTCC staff to bring "illegal drugs" into the facility "more than ever." (*Id.* at 29–30.) The influx of drugs by TTCC staff during the pandemic led to "a hell-like dope-house living condition" that exacerbated Plaintiff's chronic allergies, high blood pressure, high cholesterol, and breathing problems. (*Id.* at 30, 52.) Plaintiff sought an investigation of the drug smuggling through grievances and letters—

including a letter to Assistant TDOC Commissioner Lee Dotson—to no avail. (*Id.* at 29–30, 52; Doc. No. 27-2 at 51–54 (Exhibit 21, Grievance).) Plaintiff alleges that the TDOC has covered up TTCC's corruption for six years, "possibly with fringe benefits and under-table-compensations." (Doc. No. 27 at 52.)

Plaintiff alleges that the directions to solicit tax fraud and intercept stimulus checks filtered down from top officials: TDOC Commissioner Tony Parker and CoreCivic CEO Damon Hininger ordered TTCC Warden Raymond Byrd; Byrd ordered Donelle Harris, an Assistant Chief of Unit Management; and Harris ordered all Unit Managers, including Unit Manager Monica Thames. (*Id.* at 31, 42.) Plaintiff similarly alleges that the responsibility for receiving erroneous advice from a "wrongful" law library aide lies at the top and filters down: CEO Hininger made the TTCC policy on law library legal aides and ordered Warden Byrd to follow it; Byrd ordered the same of Kenneth Bailey, the TTCC Law Library Supervisor; and Bailey ordered the same of Law Librarian Willetta Grady. (*Id.* at 34.) None of Grady's superiors acted to "correct and retrain" her when the policy was violated. (*Id.* at 34–35.)

Plaintiff and other prisoners filed grievances regarding the solicitation of tax fraud. (*Id.* at 10, 31, 33, 42, 55.) Plaintiff also sent Assistant TDOC Commissioner Dotson a letter regarding the solicitation of tax fraud and interception of stimulus checks. (*Id.* at 42.) The letter to Dotson was "without success" (*id.*), and Plaintiff's grievances were denied at all three levels: by Assistant Chief Harris and Supervisor Bailey at Level I; by Warden Byrd at Level II; and by Assistant Commissioner Dotson at Level III. (*Id.* at 10, 31, 35, 42.)

2. Retaliatory Disciplinary Proceedings

Plaintiff filed a grievance alleging that Law Librarian Grady was responsible for Plaintiff submitting a fraudulent request for a stimulus check because Grady utilized an inmate who was a

leisure library assistant as a law library aide, and this inmate gave Plaintiff erroneous advice regarding Plaintiff's eligibility for a stimulus check. (*Id.* at 33; Doc. No. 1-1 at 43–46 (Exhibit L, Grady Grievance).) Plaintiff also filed a grievance alleging that Law Library Supervisor Kenneth Bailey was responsible for Plaintiff committing tax fraud because Brady failed to supervise Grady. (Doc. No. 27 at 37; Doc. No. 1-2 at 11–14 (Exhibit R, Bailey Grievance).) Both grievances incorporated a handwritten copy of an email exchange between Grady and a CoreCivic official. (Doc. No. 1-1 at 45 (Grady Grievance); Doc. No. 1-2 at 13 (Bailey Grievance); Doc. No. 1-2 at 37–42 (Exhibit K, Handwritten Copy of Emails); Doc. No. 27-2 at 34–35 (Exhibit 11, Copy of Emails).) These grievances were denied at all three levels. (Doc. No. 27 at 39.)

On February 2, 2021, in alleged retaliation for the grievances filed against them, Grady and Bailey "incited" TTCC School Instructor McMindes and School Supervisor David Matthew to issue Plaintiff a disciplinary charge. (*Id.* at 8, 37–38.) The Disciplinary Report reflects that Supervisor Matthew prepared the Report, which states: "I Instructor McMindes was handed papers of a grievance being filed by [Plaintiff]. In those papers there are copies of 3 emails that are identical to the format of Core Civic emails and appear to have been copied by [Plaintiff] verbatim. Therefore I Instructor McMindes am charging [Plaintiff] with Violation of Institutional Policies in Having Access to Company Emails." (Doc. No. 27-2 at 8 (Exhibit 2, Disciplinary Report).)

On March 2, 2021, during the disciplinary hearing, Instructor McMindes stated that he charged Plaintiff at the request of Law Librarian Grady. (Doc. No. 27 at 37.) At one point, according to Plaintiff's notes from the hearing, Disciplinary Hearing Officer Sgt. Lopez ordered Plaintiff to leave the room while several inmate advisors remained inside, and the inmate advisors told Plaintiff that Sgt. Lopez said, "I'm wrong in doing this, but I'm gonna find him guilty because he filed so many grievances." (Doc. No. 27-2 at 11–13 (Exhibit 2, Plaintiff's Notes).)

7

The Disciplinary Report Hearing Summary reflects that Plaintiff was found guilty under TDOC Policy 502.05(VI)(A)(65) (*id.* at 14 (Exhibit 2, Disciplinary Report Hearing Summary))—titled "Violation of TDOC/Institutional Policies," and defined as: "Failure to comply with written rules governing inmate behavior. The incident report shall cite the TDOC policy or institutional policy violated, including policy section and subsection numbers." (Doc. No. 1-2 at 35 (Exhibit U, TDOC Policy 502.05).) The findings of fact section completed by Sgt. Lopez, however, referenced TDOC Policy 502.05(VI)(A)(33) (Doc. No. 27-2 at 15 (Exhibit 2, Disciplinary Report Hearing Summary))—titled "Larceny," and defined as: "The unauthorized taking, receiving, or carrying away of state property or the personal good of another person." (Doc. No. 1-2 at 32 (Exhibit U, TDOC Policy 502.05).) Sgt. Lopez wrote that conviction was warranted "due to [Plaintiff] having hand copy of emails between CoreCivic staff that was not given to him by staff."[5] (Doc. No. 27-2 at 15 (Exhibit 2, Disciplinary Report Hearing Summary).) Sgt. Lopez issued Plaintiff a $4.00 fine, four-month commissary restriction, and thirty-day electronic restriction. (Doc. No. 27 at 37.)

Plaintiff appealed the disciplinary conviction. (*Id.*) Warden Byrd denied the appeal, but TDOC Assistant Commissioner Dotson then remanded to the TTCC disciplinary board for another hearing because the Disciplinary Report charged Plaintiff with "Violation of TDOC/Institutional Policies," and that charge requires the incident report to cite the policy violated, including the policy section and subsection number. (Doc. No. 27-2 at 17 (Exhibit 2, Disciplinary Conviction Appeal Form).) Plaintiff alleges that Warden Byrd and CoreCivic CEO Hininger are responsible for these retaliatory disciplinary proceedings because they "allow[] CoreCivic employees to arbitrarily abuse their authorities." (Doc. No. 27 at 38.) Plaintiff also alleges that TDOC

---

[5] The Court notes that the applicable term here does appear to be "hand copy" rather than "hard copy," based both on its appearance and the fact that, elsewhere on the same page, Sgt. Lopez wrote that Plaintiff "hand copied company email." (Doc. No. 27-2 at 15).

Commissioner Parker and Assistant Commissioner Dotson are responsible because they failed to act in response to Plaintiff's grievances. (*Id.* at 39.)

Meanwhile, during the pendency of Plaintiff's appeal of his disciplinary conviction, Sgt. Lopez was fired and replaced as disciplinary hearing officer by Sgt. Huntly. (*Id.* at 37–38.) On April 8, 2021, Sgt. Huntly dismissed Plaintiff's disciplinary charge. (*Id.* at 38.) However, the restrictions imposed as a result of the conviction were not lifted until April 29, 2021, and Plaintiff was not refunded the $4.00 fine. (*Id.*) Plaintiff also alleges that, while he was on commissary restriction, he spent an extra $100 to buy commissary items through other inmates. (*Id.* at 28, 38.)

### 3. Interception of Legal Mail

Plaintiff prepared a Section 1983 complaint concerning the issues alleged above, consisting of "200+ pages." (*Id.* at 44.) On February 12, 2021, Plaintiff gave the complaint to TTCC Case Manager O'Daniel for mailing to this Court, along with a form requesting to withdraw money from Plaintiff's account for postage. (*Id.*) Plaintiff alleges that, on February 22, he "found out that his legal mail . . . was not mailed out and [was] intercepted" by O'Daniel or an unnamed "Jane Doe" mailroom supervisor. (*Id.* at 7–8, 20–21, 44.) Plaintiff alleges that Supervisor Doe said the complaint would be "mailed out in early March 2021." (*Id.* at 44.)

On February 23, 2021, Plaintiff filed an "emergency grievance" against Case Manager O'Daniel regarding this alleged interception. (*Id.* at 44.) The grievance was denied at all three levels: by Unit Manager Bermudez at Level I; by Warden Byrd at Level II; and by TDOC Assistant Commissioner Dotson at Level III. (*Id.* at 46.) Plaintiff also sent Dotson a letter addressing the interception of his legal mail, "without success." (*Id.*) On February 26, the original complaint was received by this Court, and Plaintiff has "no doubt" that the complaint would not have been delivered to this Court if he did not file the emergency grievance. (*Id.*)

9

This grievance is attached to the corrected Amended Complaint, and it tells a story different from the one reflected in Plaintiff's allegations. In the attached grievance—actually dated February 24 rather than 23—Plaintiff alleged that, on February 23, Case Manager O'Daniel showed Plaintiff a print-out of his inmate trust account that did not reflect a withdrawal for postage related to the complaint Plaintiff gave O'Daniel on February 12. (Doc. No. 27-2 at 19–20 (Exhibit 3, Grievance).) According to the grievance, O'Daniel told Plaintiff that she put the complaint "on the box in front" and "it will [may] be processed in the early of the month [March]." (*Id.* at 20 (brackets and wording in original)). Plaintiff alleged: "It is clear that my legal mail has not been mailed out as of today 2/23/2021, and it is clear that my legal mail has been intercepted by the TTCC authorities." (*Id.*) Unit Manager Bermudez responded, stating that Plaintiff's trust account withdraw form was mistakenly not turned in until later, but the TTCC mailroom "received the legal mail on 2/15/21" and it was "sent out on 2/16/21." (*Id.* at 21.) This mailing date is consistent with the TTCC mail log attached to the corrected Amended Complaint, which shows outgoing mail from Plaintiff to this Court on February 16. (*Id.* at 43 (Exhibit 15, TTCC mail log).) This mailing date is also consistent with the February 17 postmark on the envelope containing the complaint , although Plaintiff is correct that the envelope was not stamped as received by this Court until February 26. (Doc. No. 1 at 47.)

Plaintiff reconstructed the allegedly intercepted Section 1983 complaint and mailed it to this Court using another inmate's name on February 25, 2021.[6] (Doc. No. 27 at 44.) Filing the reconstructed complaint cost Plaintiff about $130—$30 for postage, and $100 to "accommodate the inmate who allowed Plaintiff [] to use [the inmate's] name." (*Id.* at 46.)

---

[6] The Court received this second complaint on March 2, 2021, which initiated the opening of a new case. *See* Case No. 3:21-cv-00175, Doc. No. 1. That case was soon consolidated with this case, and all filings have been made in this case since. (*See* Doc. No. 9.)

Also on February 25, 2021, Supervisor Doe gave Plaintiff a copy of his TTCC mail log. (*Id.* at 45.) He alleges that it reflected outgoing mail to this Court "on 2/17/2021, which changed later to 2/16/2021." (*Id.*) Plaintiff suggests that Supervisor Doe "and/or" Case Manager O'Daniel falsified the postmark on the original complaint's envelope to be "2/17/2021." (*Id.*) And Plaintiff alleges that Unit Manager Bermudez's response to his emergency grievance on this subject was "a set of lies in an effort to cover-up" the interception of his legal mail. (*Id.*) Until March 8, 2021, when Plaintiff learned that the original complaint was received by the Court, Plaintiff experienced a "serious nervous breakdown." (*Id.*)

4. Continued Solicitation of Tax Fraud in 2021 and Retaliatory Transfer

Plaintiff alleges that in 2021, TTCC Law Librarian Grady and Law Library Supervisor Bailey continued to give prisoners copies of Form 1040 and instructions for using it to request a stimulus check "without clarifying [prisoners'] eligibility." (*Id.* at 48.) Grady also trained another inmate to assist prisoners to claim stimulus checks. (*Id.*) Plaintiff filed a grievance against Warden Byrd alleging that he (Byrd) was responsible for the continued solicitation of tax fraud, in addition to other wrongdoing by TTCC staff, because he hired and "ke[pt] on paying criminal and incompetent individuals." (*Id.* at 52; Doc. No. 27-2 at 51–54 (Exhibit 21, Byrd Grievance).) Plaintiff also filed a grievance against Grady and wrote a letter to TTCC officials alleging that Grady was continuing to solicit tax fraud. (Doc. No. 27 at 48; Doc. No. 27-2 at 36–37 (Exhibit 12, Letter).)

TDOC Assistant Commissioner Dotson did not respond to Plaintiff's letter, and the officials who reviewed Plaintiff's grievances "could have fixed the problem if they were not involved in" the solicitation of tax fraud. (Doc. No. 27 at 50.) These officials include Level I reviewer Bailey, Level II reviewer Warden Byrd, and Level III reviewer Dotson. (*Id.*) As with the

alleged tax-fraud solicitation scheme in 2020, Plaintiff alleges that the direction to solicit tax fraud in 2021 filtered down from top officials: TDOC Commissioner Parker and CoreCivic CEO Hininger ordered TTCC Warden Byrd; Byrd ordered Law Library Supervisor Bailey; and Bailey ordered Law Librarian Grady. (*Id.*)

On May 21, 2021, while Plaintiff's grievance against Grady was in first-level review, Plaintiff was transferred to NWCX. (*Id.* at 49.) Plaintiff alleges that NWCX is the furthest Tennessee prison from Nashville, where Plaintiff had previously expressed a desire to be transferred so he could be near a "big (South) Korean Community, Churches, and Sponsors." (*Id.* at 43, 54.) Plaintiff had 30 minutes to pack prior to transfer. (*Id.* at 49.) Plaintiff lost personal property as a result of the transfer, and he could not bring his Limited English Proficiency (LEP) Tools that were kept in the TTCC library (a Korean-English language word processor, printer, other accessories, and 8-inch fan). (*Id.*) Plaintiff made several requests to Warden Byrd to send the LEP tools to NWCX, and Byrd did not respond. (*Id.*) Plaintiff alleges that Byrd and CoreCivic CEO Hininger "are responsible for illegally withholding" Plaintiff's LEP tools. (*Id.* at 50.)

5. <u>Additional Basis for Liability Regarding TDOC Commissioner Parker and TDOC Assistant Commissioner Dotson</u>

Plaintiff alleges that TDOC Commissioner Parker was too busy to act in response to Plaintiff's grievances because Parker was seeking to become the president of the American Correctional Association (ACA), which Parker accomplished in February 2021. (*Id.* at 8, 31, 35, 42, 46–47, 50–51, 54–55.) Plaintiff alleges that Parker is also responsible for the wrongdoing alleged above because Parker contracted with CoreCivic in the first place, which Parker may not have done if he was not ACA president. (*Id.* at 31–32, 35, 43, 47, 51, 55.)

Plaintiff alleges that TDOC Assistant Commissioner Dotson is liable because he failed to follow TDOC policy as a Level III reviewer of Plaintiff's grievances, in that he provided a

"CHECK-BOX Response" rather than a "Written Response and Reason." (*Id.* at 22, 31, 35, 42, 55.)

## B. Legal Standard

To determine whether the corrected Amended Complaint states a claim upon which relief may be granted, the Court applies the same standard as under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010). The Court therefore accepts "all well-pleaded allegations in the complaint as true, [and] 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009)). An assumption of truth does not extend to allegations that consist of legal conclusions or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The Court "may also consider documents attached to the complaint." *Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707 (6th Cir. 2021) (citing *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017)). And where a document attached to the complaint "contradicts allegations in the complaint, rendering them implausible, 'the exhibit trumps the allegations.'"[7] *Id.* (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)).

## C. Discussion

"There are two elements to a § 1983 claim. First, a plaintiff must allege that a defendant acted under color of state law. Second, a plaintiff must allege that the defendant's conduct deprived the plaintiff of rights secured under federal law." *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d

---

[7] As discussed above, Plaintiff intends for the Court to consider many exhibits as attachments to the corrected Amended Complaint. (*See* Doc. Nos. 1-1, 1-2, 27-1, 27-2 (comprising 47 enumerated exhibits totaling 176 pages (some pages blank)).) Exhibits will be referenced where relevant throughout the analysis.

13

531, 539 (6th Cir. 2012) (citations omitted). Plaintiff meets the first requirement, as the named Defendants—eleven TTCC officials, two TDOC officials, and one CoreCivic official—are state actors for Section 1983 purposes. As to the second requirement, asserting that Defendants deprived him of federal rights, Plaintiff divides the corrected Amended Complaint into seven claims: Claims A through G. Many of these claims overlap or contain multiple causes of action. For clarity, the Court will consider the claims under the headings Plaintiff gave them. But for the reasons discussed below, Plaintiff does not present a viable ground for relief.

1. Claims A and F: Soliciting Tax Fraud in 2020 and 2021

Claim A is titled "Massive Tax Fraud Solicitation by State and/or local officials." (Doc. No. 27 at 25.) This claim alleges that TTCC Unit Manager Thames and others solicited prisoners to commit tax fraud in October 2020 by advising prisoners that they were generally eligible for a stimulus check if they had a social security number, giving prisoners blank copies of an IRS tax return form, and providing prisoner instructions for how to request a stimulus check using that form. Claim F is titled, in part, "Continuing Tax Fraud Solicitation." (*Id.* at 48.) In relevant part, this claim alleges that TTCC Law Librarian Grady, Law Library Supervisor Bailey, and others continued to solicit prisoners to commit tax fraud in the same manner in 2021.

Plaintiff maintains that the alleged solicitation of tax fraud cost him at least $230 ($30 in postage to file the ensuing Section 1983 complaints, $100 to "accommodate" the inmate whose name Plaintiff used to file the reconstructed complaint, and $100 to "accommodate" the inmates through whom Plaintiff ordered commissary when he was on commissary restriction). (*Id.* at 27.) Plaintiff also maintains that the tax-fraud solicitation harmed him emotionally and spiritually by potentially subjecting prisoners to criminal prosecution, providing prisoners money to support their drug habits, and costing the United States Government money. (*See id.* at 27–30.)

14

a. <u>Standing</u>

To the extent that Plaintiff is attempting to raise a tax-fraud solicitation claim on behalf of other prisoners or the U.S. Government, he does not have standing to do so. Article III of the United States Constitution requires the party invoking federal jurisdiction to establish standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted). "[S]tanding consists of three elements," such that the party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Absent class certification, prisoner[s] "lack[] standing to assert the constitutional rights of other prisoners." *Dodson v. Wilkinson*, 304 F. App'x 434, 438 (6th Cir. 2008) (*Newsom v. Norris*, 888 F.2d 371, 381 (6th Cir. 1989)). And plaintiffs do not have standing with respect to claims generally seeking "vindication of the rule of law." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998) (citing *Lujan*, 504 U.S. at 577; *Fairchild v. Hughes*, 258 U.S. 126, 129–30 (1922)). "[A]lthough a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated, that a wrongdoer gets his just deserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Id.* at 107 (citations omitted); *see also Brinkman v. Liberty Tax Serv.*, No. CV 10-192-HU, 2010 WL 5158537, at *2 (D. Or. Sept. 24, 2010) ("Brinkman's complaints about injury to the public at large, the government's loss of tax revenues, and the threat to national security are not actual or particularized injuries to himself, do not satisfy the requirements for third party standing, and are not redressible by this court."), *rep. and recommendation adopted*, 2010 WL 5157140 (D. Or. Dec. 14, 2010). Accordingly, although Plaintiff expresses concern about the effect of Defendants' alleged tax-fraud solicitation on other

15

prisoners and the Government, he is "limited to alleg[ing] violations of his own constitutional rights." *See Dodson*, 304 F. App'x at 438 (citing *Newsom*, 888 F.2d at 381).

b. <u>Frivolous</u>

Plaintiff asserts that TTCC officials violated his due process rights by "trapp[ing] inmates (including Plaintiff Song) into [committing a] criminal act." (Doc. No. 27 at 28.) Plaintiff also asserts that compelling him to engage in criminal activity violated his religious rights under the First Amendment and his right to be free from cruel and unusual punishment under the Eighth Amendment. (*Id.* at 27–28.) As explained below, however, Plaintiff's assertion that prison officials solicited him to commit tax fraud is simply frivolous. *See Hill*, 630 F.3d at 470 ("Statutes allowing a complaint to be dismissed as frivolous give 'judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.'") (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

Plaintiff traces his awareness of the alleged tax-fraud-solicitation scheme to a letter he received on November 9, 2020, from the plaintiffs' attorneys in *Scholl v. Mnuchin*. To reiterate, *Scholl* is the Northern District of California case on which Unit Manager Thames allegedly relied when informing prisoners of their general eligibility for stimulus checks in October 2020. The Court accepts as true that Plaintiff received some such letter, as the allegation of receiving a letter is non-frivolous and consistent with the attached TTCC mail log. (Doc. No. 27-2 at 43 (Exhibit 15, TTCC mail log (reflecting incoming legal mail on November 9 from the law firm of Lieff, Cabraser, Heimann, and Bernstein)).) Upon close review of the corrected Amended Complaint, however, Plaintiff does not actually give a specific description of what the letter said. Rather, Plaintiff alleges that he "found out" from the letter "that he and more than 90% of TTCC inmates

16

in fact committed a massive tax fraud because of [Unit Manager] Thames' solicitation" and the law library aide's "wrongful green-light legal advice." (Doc. No. 27 at 25.) Plaintiff goes on to provide analysis of how he believes *Scholl* applies to prisoners in general, and TDOC inmates in particular, but Plaintiff does not allege that this analysis was contained in the letter. Moreover, unlike many of the other documents referenced in the corrected Amended Complaint, Plaintiff did not file the letter as an exhibit, so the Court cannot determine whether Plaintiff's allegations are consistent with its contents.

The Northern District of California's rulings in *Scholl* are publicly available, so the Court need not rely on Plaintiff's characterization or the selected excerpts from the case attached as exhibits to the corrected Amended Complaint. Based on the Court's independent review of the *Scholl* litigation, it is clear that Plaintiff's understanding of the case is fundamentally flawed. Further, with *Scholl* as context, it is also clear that Plaintiff's allegation of a deliberate and far-reaching scheme of tax-fraud solicitation by prison officials is factually baseless and legally meritless.

The CARES Act was signed into law on March 27, 2020, and it provided "a mechanism to distribute stimulus payments" to "eligible individuals." *Scholl I*, 489 F. Supp. 3d at 1020 (citing 26 U.S.C. § 6428(d)). In the first disbursement of payments by the IRS on April 10, 2020, some "payments were sent to incarcerated individuals" because the IRS read the CARES Act as "not prohibit[ing] them from receiving a payment." *Id.* at 1022. The IRS then "changed its position" and decided that incarcerated individuals were not entitled to stimulus checks. *Id.* In *Scholl*, plaintiffs sued to challenge the IRS's change in position and sought "to certify a class of all individuals who were incarcerated across the United States since March 27, 2020 and meet the eligibility requirements described in the CARES Act." *Id.* at 1023. The court certified a class and

"read the CARES Act's definition of 'eligible individual' as plainly including incarcerated individuals." *Morton*, 2021 WL 6137867, at *1 (citing *Scholl II*, 494 F. Supp. 3d at 689). The court therefore "enjoined the IRS from withholding EIPs from members of the plaintiff class on the 'sole basis of their incarcerated status.'" *Id.* (quoting *Scholl II*, 494 F. Supp. 3d at 691–93).

Plaintiff's misunderstanding of *Scholl* appears to flow from his misstatement of the certified class. Plaintiff seems to believe that the *Scholl* class was limited to incarcerated individuals who also experienced the COVID-19 pandemic as a non-inmate, either because they (1) entered incarceration at some point between March and September 2020, or (2) were released from prison "during the pandemic." (Doc. No. 27 at 26.) Plaintiff also seems to believe that the *Scholl* class was limited to "about 85,000 inmates." (*Id.*) Plaintiff is incorrect across the board. As relevant to Plaintiff's misstatements, the actual class certified in *Scholl* consisted of "[a]ll United States citizens and legal permanent residents who are or were incarcerated . . . at any time from March 27, 2020 to the present." *Scholl v. Mnuchin*, No. 20-CV-05309-PJH, 2020 WL 5877674, at *7 (N.D. Cal. Oct. 2, 2020); *Scholl II*, 494 F. Supp. 3d at 691. The phrase "were incarcerated" did not mean that the individual must have *entered incarceration—i.e.*, become incarcerated—during that period. Contrary to Plaintiff's apparent implication, the phrase "to the present" did not refer to the date (September 24, 2020) the court provisionally certified the class for purposes of the preliminary injunction. *See Scholl I*, 489 F. Supp. 3d 1008. And the "85,000" figure in *Scholl* referred not to the size of the class, but rather to the number of inmates who received stimulus checks through the IRS's first disbursement on April 10, 2020, prior to the IRS's change in position that prompted plaintiffs to bring the case in the first place. *See Scholl I*, 489 F. Supp. 3d at 1035, 1042–43; *Scholl II*, 494 F. Supp. 3d at 676.

18

Plaintiff also seems to believe that prison officials' advice regarding the submission of Form 1040 must have been erroneous (and deliberately so) because the IRS "could have sent . . . [s]timulus checks to ALL American inmates without the 1040 Tax Forms." (Doc. No. 27 at 26.) Plaintiff is incorrect again. To allow rapid disbursement of payments, the CARES Act permitted the IRS to determine an individual's eligibility for a stimulus check using certain information it already had at the time the Act was signed into law on March 27, 2020—an individual's 2019 tax returns, or if the individual "did not file 2019 returns," then the individuals 2018 tax returns "or certain Social Security statements from calendar year 2019." *Scholl*, 2020 WL 5877674, at *1 (citing 26 U.S.C. § 6428(f)(1), (f)(5)). Some individuals, however, did not file tax returns in 2018 or 2019, but were nonetheless eligible for a stimulus check. *See id.* This includes individuals who were not required to file a tax return because they had "little to no income." *See id.* For these individuals (referred to in *Scholl* as "non-filers"), the IRS "provided a simplified method . . . to file a simplified return . . . and thus receive a[ stimulus check]." *Id.* The IRS encouraged non-filers to submit a simplified tax return through an online portal, but those who could not use the online portal could "mail a simplified paper tax return for tax year 2019." *Id.*

As part of the relief granted in *Scholl*, the court ordered the IRS to distribute certain "documents to all state and federal correctional facilities for which it maintain[ed] any communication channel," including a cover letter and "an electronic version of the simplified paper return (Form 1040/1040-SR) . . . with instructions on how to complete the simplified form." *Scholl v. Mnuchin*, No. 20-CV-05309-PJH, 2020 WL 6059648, at *2 (N.D. Cal. Oct. 7, 2020). The cover letter was to include, among other things, "a statement strongly recommending and urging prison administrators to prominently post and distribute copies of . . . Form 1040/1040-SR[] and instructions for those forms to incarcerated persons as expeditiously as possible." *Id.* The IRS

initially set a deadline for non-filers to mail the simplified tax return by October 15, 2020, but the court ordered an extension "for class members to postmark their simplified paper returns" by October 30, 2020. *Id.* at *3–4.

It appears that TDOC officials did, in fact, provide inmates with copies of simplified tax return forms and accompanying instructions for using those forms to request a stimulus check. (*See* Doc. No. 1-1 at 11–18 (Exhibits B and C, Form 1040 and Instructions).) According to a grievance response attached to the corrected Amended Complaint, these forms and instructions "came directly from the IRS." (*Id.* at 33 (Exhibit I, Grievance Response).) And the *Scholl* court took "no position on whether plaintiffs or class members [were] in fact owed advance refund payments or the amount of those payments." *Scholl II*, 494 F. Supp. 3d at 691. That determination was "left to the IRS." *Scholl I*, 489 F. Supp. 3d at 1047. Accordingly, by distributing tax return forms to inmates and providing instructions for using those forms to request a stimulus check, prison officials were acting in accordance with *Scholl*—not soliciting tax fraud.

In sum, *Scholl* drew the consequential but fairly straightforward conclusion that the IRS had an "unlawful policy" of "excluding incarcerated individuals from receiving CARES Act benefits" "on the sole basis of their incarcerated status," and it enjoined the enforcement of that policy. *Scholl II*, 494 F. Supp. 3d at 692–93. It seems that Plaintiff looked into *Scholl*, drew incorrect factual and legal inferences from the case, and jumped to the conclusion that prison officials must have been soliciting tax fraud. That conclusion prompted Plaintiff to file numerous grievances and letters, eventually leading to this lawsuit. That conclusion likewise is frivolous. Accordingly, Plaintiff fails to state a claim regarding tax-fraud solicitation.

## 2. Claim B: Advice from Inmate Working in TTCC Law Library

Claim B is titled "Denial of Constitutional Right to access to the court/legal counsel." (Doc. No. 27 at 33.) This claim alleges that an inmate working in the TTCC law library, who was functioning as a legal aide despite being not being properly qualified for that position, wrongfully advised Plaintiff on prisoners' eligibility for stimulus checks, causing Plaintiff to commit tax fraud. As discussed above, the factual premise of this claim is flawed because Plaintiff's reading of *Scholl* is incorrect. Moreover, even assuming that Plaintiff did receive flawed legal advice from an inmate in the law library, that allegation does not state a claim as a matter of law.

Plaintiff asserts that the utilization of an unqualified inmate as a legal aide violated Plaintiff's "constitutional rights to access to the court/legal counsel." (*Id.* at 34.) However, prisoners do not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). "[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Id.* (quoting *Bounds v. Smith*, 460 U.S. 817, 828 (1977)). Therefore, to state an access-to-courts claim, a prisoner must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* at 354. This is referred to as the "actual injury" requirement. *See id.* at 349.

Plaintiff incorrectly asserts that he meets the actual injury requirement through the injuries he allegedly suffered from the supposed tax-fraud solicitation. (*See* Doc. No. 27 at 34 (alleging "actual injury" from "committing a crime by filing a fraudulent tax return and being subject to Federal prosecution, as well as financial loss and physical, mental, spiritual sufferings").) But the actual injury requirement for this claim obligates Plaintiff to "plead a case within a case, alleging

the law and facts sufficient to establish both the interference with his access to the courts, and the non-frivolous nature of the claim that was lost." *Brown v. Matauszak*, 415 F. App'x 608, 612 (6th Cir. 2011) (discussing *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)). In other words, "[i]t is not enough for a plaintiff to complain in the abstract of alleged law library or legal aide deficiencies. Rather, the inmate must link such inadequacies to an actual injury regarding a particular non-frivolous legal claim." *See Phillips v. Ballard*, No. 5:17-CV-301-REW, 2019 WL 2359571, at *17 (E.D. Ky. June 4, 2019) (citing *Hadix v. Johnson*, 182 F.3d 400, 404–06 (6th Cir. 1999); *Barnett v. Luttrell*, 414 F. App'x 784, 787 (6th Cir. 2011)). Here, Plaintiff does not allege that the inmate working in the TTCC law library affected his ability to bring a non-frivolous claim. Plaintiff therefore fails to state a claim via Claim B.

      3. Claim C: Retaliatory Disciplinary Proceedings

      Claim C is titled "Retaliatory Write-Up." (Doc. No. 27 at 37.) This claim begins by recounting grievances Plaintiff filed against TTCC Law Librarian Grady and Law Library Supervisor Bailey. These grievances blamed Grady and Bailey for Plaintiff filing a supposedly fraudulent tax return, claiming that Grady and Bailey were responsible for the unqualified inmate who wrongfully advised Plaintiff on prisoners' eligibility for stimulus checks. Plaintiff asserts that TTCC officials retaliated against him for filing these grievances, by issuing him a write-up and subjecting him to disciplinary proceedings. (*Id.* at 38.) This assertion implicates Plaintiff's constitutional rights to be free from retaliation and the deprivation of due process.

      a. Retaliation

      To state a First Amendment retaliation claim, "a prisoner must prove that (1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was

motivated at least in part by the [prisoner's] protected conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999)). Here, Plaintiff fails to state a claim because he was not engaging in protected conduct when he filed the grievances that led to the allegedly retaliatory write-up and disciplinary proceedings.

"An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018) (quoting *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000)). "If the grievances are frivolous, however, this right is not protected." *Hill*, 630 F.3d at 472 (citing *Herron*, 203 F.3d at 415). Additionally, "[a]busive or manipulative use of a grievance system [is] not [] protected conduct," *Maben*, 887 F.3d at 264 (quoting *King v. Zamiara*, 680 F.3d 686, 699 (6th Cir. 2012)), "and an 'inmate cannot immunize himself from adverse administrative action by prison officials merely by filing a grievance or a lawsuit and then claiming that everything that happens to him is retaliatory.'" *Id.* (quoting *Spies v. Voinovich*, 48 F. App'x 520, 525 (6th Cir. 2002)).

The grievances against Grady and Bailey that form the basis of this claim are attached to the corrected Amended Complaint. *Cf. Hill*, 630 F.3d at 472 (noting that the court was unable to determine whether grievances were frivolous because it had "no details about those grievances beyond [the inmate's] allegations"); (*see* Doc. No. 1-1 at 43–45 (Grady Grievance); Doc. No. 1-2 at 11–13 (Bailey Grievance) (collectively, the "Grady and Bailey Grievances").) A review of the Grady and Bailey Grievances reflects that they were both frivolous and abusive or manipulative.

The only concern Plaintiff raises *on his own behalf* in these grievances is that he filed an "illegal" tax return to request a stimulus check based on the faulty advice of the unqualified inmate working in the TTCC law library. Again, however, it is Plaintiff—not this inmate or any prison official(s)—who misunderstood *Scholl* and drew erroneous conclusions about prisoners' eligibility

for stimulus checks. In other words, the same frivolous premise that underlies Plaintiff's tax-fraud solicitation claim also underlies the Grady and Bailey Grievances. Accordingly, Plaintiff did not engage in protected conduct by filing these grievances. *See Clark v. Johnson*, 413 F. App'x 804, 812–13 (6th Cir. 2011) (finding that inmate did not engage in protected conduct by filing a grievance where there was "no basis" for the "underlying complaint" in the grievance).

The Grady and Bailey Grievances were also abusive or manipulative (or both). Plaintiff attempted to use these grievances to raise a *general* concern regarding the violation of TDOC policy on inmate legal aides. Plaintiff based this concern on an email exchange that he obtained between Grady and a CoreCivic official. Plaintiff incorporated a handwritten copy of this email exchange in the Grady and Bailey Grievances.

Prisoners do not have a right to file grievances "in a manner that violates legitimate prison regulations or penological objectives." *Griffin v. Berghuis*, 563 F. App'x 411, 416 (6th Cir. 2014) (quoting *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001)). "[P]rison officials may take action in response to the prisoner's improper use of the grievance process as long as the response aligns with a legitimate penological goal." *Id.* (citing *King*, 680 F.3d at 699). Thus, "[p]rison officials are clearly free to punish inmate conduct that threatens the orderly administration of the prison." *King*, 680 F.3d at 699 (quoting *Brown v. Crowley*, 312 F.3d 782, 791 (6th Cir. 2002)).

By obtaining a private email exchange between prison officials and submitting a copy of that exchange through the grievance system, Plaintiff was clearly acting in a manner inconsistent with orderly prison administration. Grady's grievance response reflects as much, as she stated that Plaintiff was "overstepping his bounds," that Plaintiff having access to the email exchange was "a break in communications," and that the exchange was "none of [Plaintiff's] business." (Doc. No. 1-1 at 47 (Exhibit M, Grady Grievance Response).) The ensuing disciplinary charge and conviction

24

also reflect prison officials' concern that Plaintiff had access to this private email exchange. (*See* Doc. No. 27-2 at 8 (Exhibit 2, Disciplinary Report) (reflecting that Instructor McMindes charged Plaintiff with "Violation of Institutional Policies in Having Access to Company Emails"); *id.* at 15 (Exhibit 2, Disciplinary Report Hearing Summary) (stating, in written explanation for conviction, that Plaintiff was found guilty "due to [Plaintiff] having hand copy of emails between CoreCivic staff that was not given to him by staff").)

The Court recognizes that following Plaintiff's appeal, the disciplinary charge was ultimately dismissed. But an inmate's "guilt of misconduct" (or lack thereof) does not determine whether that inmate's "'allegation of protected conduct'" is sufficient to state a retaliation claim. *Maben*, 887 F.3d at 263 (quoting *Thomas v. Eby*, 481 F.3d 434, 440–42 (6th Cir. 2007)). Regardless of whether Plaintiff carries a lasting disciplinary conviction for obtaining and submitting a copy of a private email communication between prison officials, those actions were an abusive or manipulative use of the grievance system. Therefore, the filing of the Grady and Bailey Grievances was not protected conduct. *See Hunter v. Palmer*, No. 1:17-CV-109, 2019 WL 8112492, at *4 & n.2 (W.D. Mich. Nov. 26, 2019) (finding that inmate's grievance was "frivolous and/or an attempt to abuse or manipulate the grievance process" despite the inmate being found not guilty in ensuing disciplinary proceedings), *rep. and recommendation adopted*, No. 1:17-CV-109, 2020 WL 999409 (W.D. Mich. Mar. 2, 2020). Plaintiff therefore fails to state a retaliation claim via Claim C.

### b. Due Process

Prisoners "may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (citations omitted). To state a procedural (as opposed to substantive) due process claim, Plaintiff must show that (1) he had a protected liberty

or property interest; (2) he was deprived of that interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of that interest. *Janinski v. Tyler*, 729 F.3d 531, 541 (6th Cir. 2013) (citing *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)). The first prong of this claim is a threshold requirement. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Therefore, "the question of what process is due is relevant only if the inmate establishes a constitutionally protected interest." *Pickelhaupt v. Jackson*, 364 F. App'x 221, 224 (6th Cir. 2010) (citing *Wilkinson*, 545 U.S. at 224). Here, Plaintiff fails to state a due process claim both because he does not allege a constitutionally protected interest, and because he was afforded adequate process.

First, prisoners retain a liberty interest in avoiding conditions of confinement that "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). Courts consider "the nature of the more-restrictive confinement and its duration in determining whether it imposes an atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 793 (6th Cir. 2008) (internal quotation marks omitted) (collecting cases). Plaintiff, after being found guilty of a disciplinary offense, was issued a $4.00 fine, four-month commissary restriction, and thirty-day electronic restriction. This Court has previously found that it could not deem similar restrictions atypical or significant for the purpose of a due process claim. *See Barnes v. Garner*, No. 3:18-CV-01030, 2020 WL 4339649, at *2–3, 9 (M.D. Tenn. July 27, 2020) (holding that three $4.00 fines, a three-month visitation restriction, and institutional probation was not atypical or significant) (citing *Bazzetta v. McGinnis*, 430 F.3d 795, 804–05 (6th Cir. 2005)), *rep. and recommendation adopted*, No. 3:18-CV-01030, 2020 WL 4735140 (M.D. Tenn. Aug. 14, 2020) ; *Watkins v. Lindamood*, No. 1:16-CV-00092, 2018 WL 1508732, at *5 (M.D. Tenn. Mar. 27, 2018)

26

(collecting cases for the proposition that a written warning, $4.00 fine, and three-month visitation restriction was not an atypical and significant hardship).

Second, where atypical and significant hardship ultimately is implicated (unlike in the present case), "[d]ue process requires that the prisoner receive written notice of the charges against him at least 24 hours before the hearing, an opportunity to call witnesses and present documentary evidence in his defense, and a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." *Powell v. Washington*, 720 F. App'x 222, 227 (6th Cir. 2017) (citing *Wolff*, 418 U.S. at 563–67). The documents attached to the corrected Amended Complaint reflect that Plaintiff received this process: the disciplinary charge was issued on February 2, 2021, and the disciplinary hearing was not held until March 2, 2021; Plaintiff was present and had an opportunity to present a defense; and Sgt. Lopez provided a written statement. (Doc. No. 27-2 at 14–15 (Exhibit 2, Disciplinary Report Hearing Summary).) Accordingly, Plaintiff fails to state a (procedural) due process claim via Claim C.

4. Claims D and F: Intercepting Stimulus Checks in 2020 and 2021

Claim D is titled "Stimulus Check Interception." (Doc. No. 27 at 40.) This claim alleges that CoreCivic staff, including TTCC Unit Manager Thames, intercepted the stimulus checks of inmates in CoreCivic facilities for their own monetary gain. Claim F is titled, in part, "Interception of Stimulus Check." (*Id.* at 48.) In relevant part, this claim alleges that TTCC staff's continued solicitation of tax fraud in 2021 led to the continued interception of inmates' stimulus checks. (*Id.* at 49–50.) Plaintiff fails to state a claim on this basis for three reasons.

First, although Plaintiff alleges that he gave Thames a tax return form in 2020, the documents attached to the corrected Amended Complaint reflect that the IRS did not process Plaintiff's return. (*See* Doc. No. 1-1 at 35 (Exhibit J, Letter from IRS to Plaintiff dated December

27

28, 2020) ("We received your Dec. 31, 2019, Form 1040 federal individual income tax return, but we need more information to process the return accurately.").) And Plaintiff does not allege that he filed the documentation to request a stimulus check in 2021. As stated above, Plaintiff is "limited to alleg[ing] violations of his own constitutional rights," and he cannot "assert the constitutional rights of other prisoners." *See Dodson*, 304 F. App'x at 438. Because Plaintiff was not sent a stimulus check for Thames or any other CoreCivic official to intercept in 2020 or 2021, Plaintiff fails to state a claim regarding the interception of stimulus checks.

Second, even if the IRS *did* issue Plaintiff a stimulus check, and a prison official deliberately intercepted it, that would be an "unauthorized, intentional deprivation of a prisoner's property." *See Weatherspoon v. Woods*, No. 16-1277, 2017 WL 3923335, at *3 (6th Cir. Feb. 24, 2017). Such an act "does not give rise to a due process claim if the state provides an adequate post-deprivation remedy." *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)). "[T]he state of Tennessee does provide an adequate post-deprivation remedy for takings of property." *McMillan v. Fielding*, 136 F. App'x 818, 820 (6th Cir. 2005) (citing *Brooks v. Dutton*, 751 F.2d 197, 199 (6th Cir. 1985)). Plaintiff does not allege either "that he attempted a[ ] post-deprivation remed[y]," or that the post-deprivation remedy was "inadequate." *See id.* Plaintiff fails to state a claim regarding the interception of stimulus checks for this independent reason.

Third, Plaintiff's allegations on this subject are entirely speculative and unsupported by alleged factual matter. For instance, Plaintiff asserts the inference that high ranking CoreCivic and TDOC officials must have instructed TTCC officials to intercept inmates' stimulus checks because Unit Manager Thames said she was she was following supervisors' instructions by distributing tax return forms and instructions in October 2020. (*See* Doc. No. 27 at 42 ("When asked, [Thames]

28

stated that she was doing 'it' (solicitations, which led to interception for for-profit) because she was told to do by her superiors.").) Plaintiff likewise expresses his suspicion that CoreCivic used a portion of the money from intercepted checks, along with other assets such as "estates, properties, and business favor[s]," to bribe the TDOC into covering up CoreCivic's wrongdoing during yearly audits. (*Id.* at 41.) And Plaintiff further offers the theory that Unit Manager Thames used her position as a notary and her access to inmates' signatures to sign inmates' checks over to herself or other CoreCivic officials. (*See id.*) This kind of rank speculation and unsupported drawing of inferences will not suffice. *See Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 377 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 681) ("These vague and conclusory allegations of nefarious intent and motivation by officials at the highest levels of the federal government are not well-pleaded, and are therefore insufficient to 'plausibly suggest an entitlement to relief.'").

Plaintiff does make a few isolated factual assertions on this subject, but they do not have the necessary factual context to "nudge[ his] claims" of a widespread scheme by prison officials to intercept stimulus checks for personal gain "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). And "a 'naked assertion[ ] devoid of further factual enhancement' . . . is not entitled to a presumption of truth." *Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 373 (footnote omitted) (quoting *Iqbal*, 556 U.S. at 678).

Plaintiff makes a bare allegation that every inmate who gave Thames a tax return did not receive a stimulus check, but he does not provide any further factual support for that allegation, such as an explanation for how he would know this to be true. *See id.* at 374 (citations omitted) (finding that "bare allegations" without "factual context" were implausible where plaintiffs relied

29

on "vague and undated assertions of law enforcement activities directed at them"). Similarly, Plaintiff makes a bare allegation that in February 2021, he "was informed" that Thames "was in Federal custody due to her role on the inmates' stimulus check interception along with other CoreCivic employees." (Doc. No. 27 at 41.) This reads more like rumor than a factual allegation; it suggests on its face that Plaintiff has no personal knowledge of its accuracy, and it is devoid of any factual enhancement; thus, it is not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 678. In short, most of Plaintiff's check-interception allegations are pure conjecture, and the few allegations with some factual basis do not have sufficient support for the Court to consider them plausible. The Court therefore finds implausible Plaintiff's far-fetched allegation of a deliberate, ongoing scheme to intercept inmates' stimulus checks for the benefit of CoreCivic and CoreCivic staff members. *See Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) ("[L]itigation . . . alleging . . . a vast, encompassing conspiracy . . . must meet a high standard of plausibility."). For all of these reasons, Plaintiff fails to state a claim regarding the interception of stimulus checks.

     5. Claim E: Interception of Legal Mail

     Claim E is titled "Legal Mail Interception." (Doc. No. 27 at 44.) This claim alleges that TTCC Case Manager O'Daniel and Mailroom Supervisor Doe intercepted the original complaint in this case (en route from Plaintiff to this Court), allowing it to be sent to this Court only after Plaintiff filed an emergency grievance on the matter. Plaintiff fails to state a claim on this basis as a matter of fact and law.

     The record reflects that prison officials submitted the original complaint for mailing to this Court one week before Plaintiff filed the emergency grievance. That is, the postmark on the envelope containing the complaint is February 17, 2021, and Plaintiff dated the emergency grievance February 24. Plaintiff seems to believe that O'Daniel "and/or" Supervisor Doe must

30

have placed a false postmark on the envelope to cover up the interception because the Court did not receive the Complaint until February 26. But that is unsupported speculation that is rendered implausible by the exhibits to the corrected Amended Complaint. *See Nolan*, 991 F.3d at 707 (explaining that, when an exhibit to a complaint contradicts allegations, "the exhibit trumps the allegations") (quoting *Williams*, 498 F. App'x at 536). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'Ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (citing *Iqbal*, 556 U.S. at 682; *Twombly*, 550 U.S. at 567). Here, given the postmark on the envelope, and the absence of alleged factual matter to support his speculative assertion that prison officials falsified the postmark date, the complaint far more likely experienced an ordinary mail delay than intentional interception by prison officials. Because Plaintiff's allegation of interference with his legal mail is implausible, he fails to state a claim on this basis.

Moreover, even if prison officials delayed delivery of the original complaint, he fails as a matter of law to state an access-to-courts claim. As discussed above, this claim requires Plaintiff to allege that he suffered actual prejudice to his pursuit of a non-frivolous legal claim. *See Lewis*, 518 U.S. at 351. "Examples of actual prejudice to pending or contemplated litigation include having a case dismissed, being unable to file a complaint, and missing a court-imposed deadline." *Harbin-Bey v. Rutter*, 420 F.3d 571, 578 (6th Cir. 2005) (citing *Jackson v. Gill*, 92 F. App'x 171, 173 (6th Cir. 2004)). And as the course of litigation in this case reflects, any delay between Plaintiff delivering the original complaint to prison officials and the Court receiving the complaint did not prejudice Plaintiff in any way. Accordingly, Plaintiff fails to state a claim via Claim E.

6. Claim F: Retaliatory Transfer and Withholding Plaintiff's Personal Property

The remainder of Claim F is titled "Sudden Transfer/Withholding Plaintiff Song's Personal Property." (Doc. No. 27 at 48.) In pertinent part, this claim begins with a recounting of two grievances and a letter Plaintiff submitted alleging that TTCC officials were continuing to solicit tax fraud in 2021. One grievance was filed against Warden Byrd, and the other was filed against Law Librarian Grady. Plaintiff asserts that TTCC officials retaliated against him for submitting these documents by suddenly transferring him to NWCX while the latter grievance was in first-level review. Plaintiff alleges that he lost personal property as a result of the transfer and that prison officials have not sent him his LEP tools that were kept in the TTCC library. The Court will consider Plaintiff's retaliation claim before addressing Plaintiff's allegedly withheld property.

a. Retaliation

To reiterate, a First Amendment retaliation claim requires a prisoner to plausibly allege that "(1) he engaged in protected conduct, (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'" *Hill*, 630 F.3d at 472 (6th Cir. 2010) (quoting *Thaddeus-X*, 175 F.3d at 394). Here, Plaintiff fails to state a claim because he was not engaging in protected conduct when he submitted the grievances and letter that allegedly led to the transfer.

Prisoners do not have a constitutionally protected right to file grievances that are "frivolous," or to file grievances in a manner that is "[a]busive or manipulative." *Maben*, 887 F.3d at 264 (internal citations and quotation marks omitted). The grievance against Byrd (Doc. No. 27-2 at 51–54 ("Byrd Grievance")) and Plaintiff's letter to TTCC officials (Doc. No. 27-2 at 36–37) are attached as exhibits to the corrected Amended Complaint. The grievance against Grady is not.

32

Considering the exhibits along with Plaintiff's description of the grievance against Grady, however, the Court concludes that these submissions were both frivolous and abusive or manipulative.

First, as explained throughout this opinion, Plaintiff's underlying concerns in these submissions—TTCC officials' alleged continued tax-fraud solicitation and stimulus-check interception in 2021—are frivolous. Plaintiff therefore was not engaged in protected conduct in making these submissions. *See Clark*, 413 F. App'x at 812–13.

Second, it is also clear that Plaintiff was using these submissions to pursue a personal campaign against Law Librarian Grady because Plaintiff was upset that he was fired from a position in the library. The first among these submissions was the Byrd Grievance. This grievance is dated March 12, 2021, and it essentially blames Byrd for all of the wrongdoing alleged in this action (and more). Among other things, Plaintiff used this grievance to complain that Law Librarian Grady fired him from working in the library. Plaintiff stated: "As God is the witness, she will pay for that one way or the other." (Doc. No. 27-2 at 53.) Plaintiff also wrote: "I am a legal aide. I will do legal work one way or the other." (*Id.* at 51, 54.) The letter to TTCC officials, dated April 27, 2021, focuses on the alleged continuation of tax-fraud solicitation and stimulus-check interception in 2021. Within this letter, Plaintiff refers to Grady as an "anti-governmentalist who is trying to hurt our Government, financially & economically." (*Id.* at 37.) Plaintiff also states: "Someone must stop Ms. Willetta Grady, the CoreCivic employee, TTCC library staff." (*Id.*) As to the grievance against Grady, Plaintiff alleges only that it concerned Grady's alleged continued solicitation of tax fraud, and that it was in first-level review when he was transferred on May 21, 2021. (Doc. No. 27 at 48–49.)

33

In short, Plaintiff stated in the Byrd Grievance that Grady would "pay for" firing him from the library "one way or the other," he stated in the letter to TTCC officials that Grady was an "anti-governmentalist" whom "someone must stop," and he filed a grievance against Grady repeating his frivolous concern of tax-fraud solicitation. Such abusive or manipulative behavior is not protected conduct. *See King*, 680 F.3d at 699.

The Court also notes that part of the relief Plaintiff requested in the Byrd Grievance was transfer to a facility that is not operated by CoreCivic. (Doc. No. 27-2 at 51, 54.) It does not appear that Plaintiff was transferred as a direct result of that request, given that the grievance response states (among other things)[8] that Plaintiff could "request a transfer to a state facility by writing [and] submitting the request to the Classification Coordinator [at] each site." (*Id.* at 56.) But Plaintiff did receive this relief when he was transferred to NWCX, which is not operated by CoreCivic.

Additionally, based on a letter Plaintiff sent to the TTCC grievance chairperson after his transfer to NWCX, Plaintiff had no less than thirteen grievances pending at TTCC that had not completed every level of review as of June 18, 2021. (*Id.* at 46–47 (Exhibit 18, Reconstructed Letter).) And a prisoner can "legitimately be transferred in order 'to give prison staff a respite from his continuous barrage of grievances'" where doing so allows prison administrators "'to maintain the peaceful management of the prison by reducing the tension between the staff and [the prisoner] without discouraging him from seeking redress of his grievances.'" *Griffin*, 563 F. App'x at 416 (quoting *Ward v. Dyke*, 58 F.3d 271, 274 (6th Cir. 1995)). Although Plaintiff alleges that he has not had access to his LEP tools since his transfer to NWCX, that has not prevented Plaintiff from

---

[8] This grievance response also states that the Byrd Grievance "addresses multiple issues that span across one y[ear]" and that there was "no evidence to support any of the allegations contained w[ith]in this grievance." (Doc. No. 27-2 at 56.)

submitting numerous filings in this case since that time (*see* Doc. Nos. 22–23, 25, 27–40), including the corrected Amended Complaint that is currently before the Court. Plaintiff also filed many more grievances after his transfer to NWCX. (*See* Doc. No. 25 at 1; Doc. No. 27 at 49; Doc. No. 40 at 8 (listing 22 grievances that Plaintiff allegedly filed at NWCX).) Transfer to NWCX thus did not prevent Plaintiff from exercising his constitutional right to seek redress of grievances. For all of these reasons, Plaintiff fails to state a retaliation claim arising from his transfer to NWCX.

b. Withholding Property

Plaintiff asserts that prison officials "illegally" withheld his personal property following his transfer to NWCX. (Doc. No. 27 at 49–50.) The Court construes this as a procedural due process claim. *See Garrison v. Walters*, 18 F. App'x 329, 332 (6th Cir. 2001) (concluding that a "district court properly concluded that [a prisoner's] allegations involve[d] procedural due process rights" where the prisoner alleged that prison staff deprived him of personal property, *i.e.*, a photo album). Plaintiff does not specify whether this deprivation of property was negligent or intentional. (*See* Doc. No. 27 at 49–50.) Either way, however, the "negligent or intentional deprivation of property is not actionable under § 1983," *Garrison*, 18 F. App'x at 332 (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)), "unless the state fails to provide the plaintiff with an adequate post-deprivation remedy." *Id.* (citing *Parratt*, 451 U.S. at 543). Tennessee provides an adequate remedy. *See McMillan*, 136 F. App'x at 820 (citing *Brooks*, 751 F.2d at 199). Plaintiff therefore fails to state a procedural due process claim on this basis.

The Court also recognizes, as addressed above, that some of the allegedly withheld property included Plaintiff's LEP tools. Plaintiff asserts that the deprivation of his LEP tools violated his rights to access the courts and to equal protection. (Doc. No. 27 at 49.) But Plaintiff does not allege that this deprivation resulted in "actual prejudice to pending or contemplated

35

litigation," so he fails to state an access-to-courts claim. *See Harbin-Bey*, 420 F.3d at 578 (citing *Jackson*, 92 F. App'x at 173). And Plaintiff does not provide any factual allegations specifically to the effect that the deprivation of his property was motivated by his membership in a protected class, so he likewise fails to state an equal protection claim. *Bishawi v. Ne. Ohio Corr. Ctr.*, 628 F. App'x 339, 345 (6th Cir. 2014) (citing *Harden-Bey*, 524 F.3d at 796). For all of these reasons, Plaintiff fails to state a claim arising from the withholding of his personal property following his transfer to NWCX.

### 7. Claim G: TDOC's Cover-Up of CoreCivic's Corruption

Claim G is titled "Deeply Rooted Corruption in for-profit private prison CoreCivic-run TTCC and the endless cover-up by TDOC." (Doc. No. 27 at 52.) This claim alleges that TTCC has been corrupt for six years, and that TTCC staff "openly and widely" smuggled drugs into the facility during the pandemic. (*Id.*) This claim also alleges that TDOC must have covered up this corruption because otherwise TTCC would not have survived yearly audits. (*Id.*) In exchange for the cover up, Plaintiff alleges, CoreCivic has "possibly" given TDOC staff and their family members "fringe benefits and under-table-compensations . . . such as car (payment), estate, building, house, tuition, . . . business opportunities, and cash money." (*Id.*) The Court construes this as a conspiracy claim.

To "successfully ple[a]d a § 1983 conspiracy," Plaintiff must allege "that (1) a single plan existed, (2) the conspirators shared a conspiratorial objective to deprive the plaintiffs of their constitutional rights, and (3) an overt act was committed." *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007) (citing *Memphis, Tenn. Area Loc., Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004)). For two reasons, Plaintiff fails to state a claim.

First, "[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987)). Thus, Plaintiff's conclusory and speculative allegations of a wide-ranging conspiracy to cover up wrongdoing at TTCC fail to state a claim. *See Hull v. Baker*, No. 1:11-CV-623, 2011 WL 5361061, at *10 (W.D. Mich. Nov. 4, 2011) ("A simple allegation that defendants conspired to cover up wrongful actions is too conclusory and too speculative to state a claim of conspiracy.") (citing *Birrell v. Michigan*, No. 94-2456, 1995 WL 355662, at *2 (6th Cir. June 13, 1995)).

Second, for the reasons discussed throughout this opinion, Plaintiff fails to state a claim arising from Claims A through F, which set forth the alleged predicate constitutional violations underlying the conspiracy. (*See* Doc. No. 27 at 52 (alleging a conspiracy to cover up corruption "while inmates suffered due to the Tennessee Prison officials violation as mentioned Claims A~F").) Accordingly, "any claim of conspiracy with respect to these allegations necessarily fails." *Weatherspoon*, 2017 WL 3923335, at *4 (citing *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013)).

### 8. Failure to State a Claim Against Supervisors and TDOC Officials

Finally, in addition to Plaintiff's underlying claims being without merit, Plaintiff also fails to allege the level of personal involvement necessary to impose liability on several Defendants under Section 1983. "Section 1983 liability must be premised on more than . . . the right to control one's employees." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). "A supervisory official's failure to supervise, control or train [an] offending individual is not actionable unless the supervisor 'either encouraged the specific

37

incident of misconduct or in some other way directly participated in it.'" *Jones v. Clark Cnty., Ky.*, 959 F.3d 748, 761 (6th Cir. 2020) (quoting *Shehee*, 199 F.3d at 300).

Here, Plaintiff does not make factual allegations specifically indicating sufficient personal involvement by TTCC Warden Byrd, Assistant Chief of Unit Management Harris, CoreCivic CEO Hininger, TDOC Commissioner Parker, or Assistant TDOC Commissioner Dotson. That is because "[t]he 'denial of administrative grievances or the failure to act' by prison officials does not subject supervisors to liability under § 1983." *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008) (quoting *Shehee*, 199 F.3d at 300). To the extent that Plaintiff is attempting to impose liability on these Defendants (or any other Defendants) for handling his grievances improperly under applicable prison policies, Plaintiff likewise fails to state a claim. *See Hursey v. Anderson*, No. 16-1146, 2017 WL 3528206, at *2 (6th Cir. Mar. 31, 2017) (citations omitted) (affirming dismissal of prisoner's claims "premised on the mishandling of his grievances or violation of the prison's policies").

### III. MOTION FOR PRELIMINARY INJUNCTION (Doc. No. 40)

After Plaintiff's transfer from NWCX to his current place of confinement, Northeast Correctional Complex (NECX), Plaintiff filed a motion requesting that the Court enter a preliminary injunctive order requiring prison officials to transfer him back to NWCX, transfer him to a housing unit at NECX where gang-affiliated inmates do not reside, respond to his grievances, and provide him adequate medical treatment and legal assistance. (Doc. No. 40 at 6.) Preliminary injunctive relief is "an extraordinary and drastic remedy." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). In deciding whether to grant a preliminary injunction, the Court considers: (1) whether the moving party has a strong likelihood of success on the merits; (2) the threat of

irreparable injury to the moving party; (3) potential harm the injunction would cause to third parties; and (4) the public interest. *Id.* (citing *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). Regardless of how these factors balance, however, the Court cannot issue a preliminary injunction "where there is simply no likelihood of success on the merits." *Id.* (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010)).

Here, for the same reasons that this action must be dismissed, Plaintiff cannot demonstrate a likelihood of success on the merits. Moreover, Plaintiff's requests for injunctive relief are unrelated to the claims asserted in the corrected Amended Complaint, and the Court "may not grant injunctive relief to remedy an alleged [constitutional] violation" that "is not at issue in th[e] suit" before the Court.[9] *See King v. Zamiara*, 788 F.3d 207, 217–18 (6th Cir. 2015) (citing *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *see also Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) ("[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.") (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir.1994)). Accordingly, Plaintiff's motion for a preliminary injunction will be denied.

### IV. MOTION TO APPOINT COUNSEL (Doc. No. 33)

Plaintiff requests the appointment of counsel. (Doc. No. 33.) "The appointment of counsel in a civil proceeding is not a constitutional right and is justified only in exceptional circumstances." *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003) (citing *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993)). Because this case is subject to dismissal at the initial review stage, the

---

[9] To challenge any allegedly unconstitutional conditions of confinement at NECX, Plaintiff must bring a separate Section 1983 case against the persons or entities directly responsible for those conditions. Such a case should be filed in the proper judicial district. *See* 28 U.S.C. § 1391(b) (setting forth the proper venue in which to bring a civil action). The Court expresses no opinion on the viability of any case Plaintiff may file in the future.

39

appointment of counsel is not warranted. *See Richmond v. Settles*, 450 F. App'x 448, 452 (6th Cir. 2011) (citations omitted) ("Counsel should not be appointed . . . where a pro se litigant's claims are frivolous or when the chances of success are extremely slim."). This motion will be denied.

### V. MOTION TO SEAL (Doc. No. 30)

Plaintiff requests that the Court place under seal the name of a TTCC inmate referenced in the corrected Amended Complaint and direct all parties in this case to refer to this inmate using a redacted form. (Doc. No. 30 ("Motion to Seal"), at 2–3.) Plaintiff also requests that the Court seal a portion of his request for relief in the corrected Amended Complaint. (*See id.* at 3.)

There is "a 'strong presumption in favor of openness' as to court records." *Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016) (quoting *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983)). The proponent of sealing has a heavy burden requiring that party to "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations." *Id.* (quoting *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 545 (7th Cir. 2002)); *see also* M.D. Tenn. Local Rule 5.03(a)–(b) (("[T]he party who . . . seeks to restrict access to the materials retains the burden of" "demonstrat[ing] compelling reasons to seal the documents . . . . Generally, only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence is typically enough to overcome the presumption of public access."). To carry this heavy burden, Plaintiff must show that sealing the case in the requested manner will prevent "a clearly defined and serious injury[.]" *Shane Grp.*, 825 F.3d at 307 (quoting *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001)). Plaintiff has made no such showing. Therefore, the Motion to Seal will be denied.

**VI. MOTION TO AMEND (Doc. No. 31) AND TO SERVE (Doc. No. 32)**

Plaintiff filed a "Motion to Amend Defendants' Names and Addresses" (Doc. No. 31), requesting that the Court "automatic[ally] amend Defendants['] full names and addresses." Plaintiff also filed a Motion to Serve (Doc. No. 32), requesting that the Court instruct the U.S. Marshals to serve process on Defendants. Because this case is not proceeding past the initial review stage, these motions will be denied as moot.

**VII. CONCLUSION**

For these reasons, this action will be dismissed with prejudice for failure to state a claim upon which relief may be granted under Section 1983. Plaintiff's motions for exhibits (Doc. Nos. 28, 29) and to supplement (Doc. No. 34) will be granted. Plaintiff's motions requesting a preliminary injunction (Doc. No. 40), the appointment of counsel (Doc. No. 33), and to seal (Doc. No. 30) will be denied. Plaintiff's motions requesting to amend Defendants' names and addresses (Doc. No. 31) and to serve Defendants (Doc. No. 32) will be denied as moot.

An appropriate Order will be entered.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

41